Mary FROST, Plaintiff,

v.

CHRYSLER MOTOR CORPORATION, Defendant.

Nos. CIV–92–282–R, CIV–92–2198–R.

United States District Court,
W.D. Oklahoma.

June 4, 1993.

Steven M. Angel, Oklahoma City, OK, for plaintiff.

Gayle L. Barrett, Brooke S. Murphy, Crowe & Dunlevy, Oklahoma City, OK, Gregory S. Muzingo, Gregory R. Ridella, Highland Park, MI, for defendant.

## ORDER

DAVID L. RUSSELL, District Judge.

Before the Court are the Defendant's Motion for Summary Judgment and the Plaintiff's Motion for Partial Summary Judgment. Each party's Motion has been fully briefed, counsel have appeared for oral argument, and the motions are at issue.

### I. Background

The Plaintiff, Mary Frost, brings these consolidated actions under Title 42 U.S.C. § 1981 and the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e et seq.[1] Frost, a white female, claims that she was denied employment with Chrysler, and an opportunity to enter into a contractual relationship with Chrysler because of her race.[2]

Most of the approximately 5,000 Chrysler dealerships are owned by private investors and are privately capitalized.[3] Chrysler has adopted a Marketing Investment program to enable it to place dealerships in those areas in which it has found no private investors with sufficient capital to open a dealership.[4] Approximately 67 Chrysler dealerships are capitalized by and are wholly or partially owned by the Chrysler Motor Corporation through its Marketing Investment Program ("MIP").[5] Chrysler pays the dealers who operate and manage these company-owned dealerships a salary and bonuses, and insurance benefits, and provides them with the use of an automobile.[6]

In 1991 Frost applied for the Edmond Oklahoma Dodge dealership. At the time, she had approximately fourteen years' work experience with several car dealerships in various capacities. Frost was considered by the zone manager to be qualified for the position she sought.[7] At the time her application was rejected, Frost was the only qualified applicant.[8]

The Edmond Dodge dealership is one of Chrysler's 67 MIP dealerships.[9] Some of the individuals selected for the MIP dealerships are graduates of a Chrysler training program known as the Minority Dealer Development Program; others are selected based upon their experience in the automotive industry.[10]

---

1. The Plaintiff's Complaints alleged that Chrysler's affirmative action plan discriminated against white persons, specifically "disadvantaged whites (females)." In their cross-motions for summary judgment, the parties have addressed the issues pertinent to race discrimination only. Frost has made no further reference to and offered no evidence of gender-based discrimination. Thus, assuming Frost's Complaints are intended to state claims of gender-based discrimination, the Court does not address such claims at this time.

2. Frost originally brought her first Complaint (in CIV–92–282) "individually and as a representative of a class of qualified white female applicants." Frost has now withdrawn her prayer for class certification, and is proceeding solely in her individual capacity. See Advisory to the Court, October 1, 1992.

3. See Affidavit of Joseph J. Shady, October 19, 1992, par. 4.

4. Shady Affidavit, pars. 4–5.

5. Id.

6. "Dealer Ownership, Chrysler Marketing Investment brochure ("MIP brochure"), attached as Exhibit "A" to Shady Affidavit, Deposition of Joseph J. Shady of June 30, 1992, p. 64. The MIP dealer's bonus is equal to 25 percent of the operating profits before taxes.

7. See Application of Mary Hand Frost, July 10, 1991 (Exhibit 1 to Plaintiff's Motion for Partial Summary Judgment). Deposition of Raymond Skillington, September 11, 1992, pp. 25, 33, 34 (Frost more qualified than individual eventually placed in the dealership); Letter from J.J. Shady to Frost, September 19, 1991 ("I understand you may be a qualified prospect."); Deposition of Mary Hand Frost, August 27 and September 1, 1992, pp. 9–13, Deposition of James Hudnall, September 11, 1992, pp. 47–50.

8. Skillington deposition, p. 25.

9. Letter from J.J. Shady to Frost, September 19, 1991. Shady Affidavit, par. 12.

10. Deposition of Cecil M. Ward, September 3, 1992, p. 68 (Participation in the MDDP program is not a prerequisite to placement in an MIP dealership).

The new MIP dealers are not required to make any initial investment in the dealership, but are required to place some funds in a trust account for possible investment at a later date.[11] Over a period of time, a successful MIP dealer can buy out Chrysler's ownership interest, and acquire full ownership of the dealership.[12]

Chrysler asserts that the Edmond Dodge dealership was reserved for a black trainee under Chrysler's Minority Dealer Development Program ("MDDP").[13] In conjunction with the MDDP, Chrysler adopted a policy referred to as the "Minority Dealer Right of First Refusal"[14] which gave the Chrysler Black Dealers Association a right of first refusal over all MIP dealerships with a sales planning potential of 300 units or more. This policy was modified in July, 1989 when Chrysler entered into a "Fair Share Agreement" with the National Association for the Advancement of Colored People ("NAACP"), giving the Chrysler Black Dealers Association a "right of first refusal" over dealerships with a planning potential of 500 units or more.[15] By the time Frost applied for the Edmond Dodge dealership in September, 1991, Chrysler's right of first refusal policy applied to dealerships with planning potentials of 500 units or more, and the Edmond Dodge dealership had a planning potential of 423 units. Although the dealership had a sales planning potential below 500 units, Chrysler determined that it should remain a "black" dealership because it had been operated by a black dealer for several years prior to the vacancy, and because it was an especially desirable dealership.[16] After Frost's application was rejected, the dealership was managed by an interim manager, who remained in the dealership until a black candidate could be found.[17] After approximately six months, a black male was selected as the Marketing Investment Program dealer for the Edmond Dodge dealership.[18]

The MIP dealerships present an opportunity for a qualified individual to acquire a valuable ownership interest in a dealership with a limited capital investment, while at the same time earning a competitive salary.[19] Although private capitalization may be more desirable for those who have the means, the "MIP" dealerships are considered very desirable, and there are usually more applicants than available positions.[20] Chrysler fills ap-

11. The amount of the escrow deposit required depends upon the particular dealership. The Edmond Dodge dealership would have required the prospective dealer to deposit $65,000.00 in unencumbered funds. The privately capitalized dealerships require an actual investment of a substantial amount of money, generally in the area of $1,000,000.00. Deposition of Linda Murphy, September 3, 1992, pp. 53–54, Marketing Investment Program brochure, Shady Deposition, pp. 50–51.

12. Marketing Investment Program brochure, Murphy Deposition, pp. 61–62; Shady Deposition, p. 46 (the average MIP dealer retires Chrysler's stock in approximately 36 to 48 months, but there is no time limit as long as the dealer shows progress).

13. Chrysler's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, December 4, 1992, pp. 2–4.

14. Affidavit of Cecil M. Ward, par. 3.

15. The term "right of first refusal" is a term of art used in contract law to describe a contractual right much different than that which Chrysler granted to the Chrysler Black Dealers Association. A right of first refusal is, ordinarily, the right to purchase some specified property before it is offered for sale to another or before an offer to purchase by another is accepted. In the event the holder does not elect to exercise the right of first refusal, the party subject to it is free to sell the property to whomever he chooses. In this case, the Chrysler Black Dealer's Association was given much more than a right to claim the Edmond Dodge dealership before it was offered to Frost—the Association was permitted to bar Chrysler from hiring Frost, a qualified applicant, even though the Association had no one to fill the position at the time, or for six months thereafter.

16. Shady Deposition, pp. 206–207. Ward Deposition, pp. 37–38. According to Mr. Ward, the Edmond Dodge dealership was reserved for a black candidate because "the working capital was right," the store's reputation was good, its location was "adequate," (on a main thoroughfare), and it was slated to be relocated to an "even better" site.

17. Ward Deposition, pp. 52–54.

18. *Id.*

19. MIP brochure, pp. 2–3, 5–6.

20. Shady Deposition, p. 47. ("Most of the time, all of the time that I can remember, always have more applicants than we have [MIP] dealerships.")

proximately ten MIP dealership positions annually.[21]

The Chrysler Black Dealers Association, which holds the "right of first refusal" over the larger Chrysler-owned dealerships, is a group comprised of black, elected representatives who are Chrysler dealers.[22] Mr. Cecil Ward, a black male who is Chrysler's Manager of Retail Development, serves as a representative and board member of the Chrysler Black Dealers Association.[23] Mr. Ward speaks for the Chrysler Black Dealers Association, and either exercises or waives the right of first refusal with respect to each available MIP dealership with a sales planning potential of 500 units or more.[24] When Mr. Ward exercises the Association's right of first refusal, the dealership position goes to a black person, usually a graduate of Chrysler's Minority Dealer Development Program.[25] Mr. Ward claims the right of first refusal over those MIP dealerships which have the best opportunity for a trainee to be successful. Sometimes Ward declines to exercise the right.[26]

Neither the Fair Share Agreement, with its right of first refusal, nor the MDDP training program has an express time or number limitation. The Fair Share Agreement "anticipates" an annual increase of seven percent in black dealers, but it does not require a minimum increase, nor does it contain any provision for expiration when any particular quota is reached.[27]

Most of the black MIP dealers are graduates of Chrysler's Minority Dealer Development Program ("MDDP").[28] The MDDP is a formal dealer ownership training program, with the purpose of increasing the number of qualified minorities eventually eligible to become independent Chrysler dealers.[29] Chrysler extensively recruits black candidates for the Minority Dealer Development Program.[30] No other disadvantaged groups are recruited in a similar fashion, and white persons are not eligible for the MDDP training program.[31]

## II. *Prima Facie Case of Discrimination*

Frost first filed her Complaint in Case Number CIV–92–282–R, alleging a violation of Title 42 U.S.C. § 1981. After exhausting her administrative remedies before the Equal Employment Opportunity Commission, Frost brought her second Complaint in Case Number CIV–92–2198–R, alleging a violation of Title VII.[32] The cases have now been consolidated.

**21.** Murphy Deposition, p. 33

**22.** Shady Deposition, pp. 219–221.

**23.** *Id.*

**24.** In the Kansas City zone which encompasses the central Oklahoma area, the right of first refusal has been exercised with respect to all three dealerships. The parties have submitted no evidence of how often the right of first refusal is exercised, or how often, if ever, it is waived. Chrysler's evidence shows that there are substantial numbers of MIP dealers who are not black. These dealers may be working in the smaller dealerships which are not subject to the right of first refusal, or they may be working in dealerships for which the right of first refusal has been waived, or they may have been placed in an MIP dealership prior to the July, 1989 Fair Share Agreement.

**25.** Shady Deposition, pp. 219–221.

**26.** Shady deposition, p. 220, ("more often than not, he passes on the store.") It appears that there are more MIP dealership positions to fill each year than MDDP graduates. Approximately

three trainees graduate from the MDDP training course each year, and approximately ten dealerships are available. During Mr. Ward's tenure as Director of Retail Development, all of the trainees have been black. Ward deposition, pp. 30–31. "A few" of the trainees have failed to complete the program, or have "decided to do something else." Ward deposition, p. 30. According to Chrysler, the graduates are placed in those available MIP dealerships where they have the greatest chance of success.

**27.** Fair Share Agreement, July 11, 1989, p. 4.

**28.** Ward deposition, pp. 30–31.

**29.** Minority Dealer Development Program brochure.

**30.** Ward deposition, pp. 16–17.

**31.** Ward deposition, pp. 16–17; Deposition of James Michael Hudnall, September 11, 1992, pp. 50–51; MDDP brochure, p. 2.

**32.** On July 14 and 15, 1992, respectively, Frost filed identical charges of race and sex discrimination with the Oklahoma Human Rights Com-

1294

Both parties rely primarily upon decisions construing Title VII, and counsel for the parties agreed at oral argument that the analysis of whether Chrysler discriminated in its hiring decision, and of the validity of Chrysler's affirmative action plan, is the same under Title VII and Section 1981. *Accord; Setser v. Novack Investment Co.*, 657 F.2d 962, 967–968 (8th Cir.1981), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981) ("in fashioning a substantive body of law under section 1981 the courts should, in an effort to avoid undesirable conflicts, look to the principles of law created under Title VII for direction. Divergent standards under the two statutes would render employers unable to remedy some past discriminatory practices. . . .") *quoting Patterson v. American Tobacco Co.*, 535 F.2d 257, 270 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976). In this case, Frost alleges both a refusal to enter into a contract (governed by Section 1981) and a failure to hire (governed by Title VII). The Court concludes that both claims are governed by the same standards.

The uncontroverted evidence meets Frost's burden of showing a prima facie case of race discrimination.[33] Frost has shown that she was qualified for the position she sought, that she was rejected on account of her race, and that the position remained open after she was rejected. This shifts to Defendant Chrysler the burden of proffering a legitimate reason for refusing to enter into a contractual/employment relationship with Frost, such as the existence of a valid affirmative action program.

Chrysler contends that it rejected Frost's application for the Edmond Dodge dealership because that dealership had been reserved for a black person as a part of Chrysler's voluntary affirmative action program. Chrysler cites *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) and *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987),[34] in support of its position that, in making hiring decisions, an employer may lawfully

mission and the Equal Employment Opportunity Commission ("EEOC"). On August 12, 1992, the EEOC, on the stated basis that it would be "unable to complete its process within 180 days from the filing of the charge," issued Frost a Notice of Right to Sue under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

33. The version of Section 1981 which was in effect at the time of which Plaintiff complains read in pertinent part:

All persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment . . . and no other.

Section 1981 was interpreted by the Supreme Court as applying only to a discriminatory refusal to enter into a contractual relationship, i.e., failure to hire or to promote, and not to post-employment discrimination. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In November, 1991, Congress passed the Civil Rights Act of 1991 which amended Section 1981 to include post-formation discrimination. The Amendment is not significant in this instance because the Plaintiff's claims are clearly encompassed in both versions of Section 1981.

34. Although the defendant in *Johnson* was a state agency, the Plaintiff's claim was brought under Title VII, and not as a Section 1983 claim alleging denial of equal protection. The Defendant points out that the test of an affirmative action plan differs under Title VII and Section 1981 from that under 1983. Private employers' plans can be challenged only under Title VII or Section 1981, and must be justified by the existence of a "manifest imbalance in a traditionally segregated job category. Once this imbalance is demonstrated, the court must also consider whether the rights of the discriminatee are unnecessarily trammeled by the affirmative action plan. Public employers' plans, if challenged in an equal protection claim brought under Section 1983, are reviewed under the more demanding "strict scrutiny" analysis. Under strict scrutiny analysis, the preference given to the minority by a public employer must be justified by a compelling governmental interest that is achieved only through narrowly tailored means. *Cunico v. Pueblo School District No. 60*, 917 F.2d 431 (10th Cir.1990), *citing Johnson v. Transportation Agency*, 480 U.S. at 632–33, 107 S.Ct. at 1452; and *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In this case, the Court is concerned only with Title VII and Section 1981, and not with an equal protection claim brought under Section 1983. The Supreme Court's decision in *Johnson, supra,* which was based solely upon Title VII analysis and not upon the more demanding equal protection analysis, is, therefore controlling.

discriminate in favor of a racial minority pursuant to a valid affirmative action plan. Frost, as Plaintiff, bears the ultimate burden of showing that the race-conscious affirmative action plan is invalid, or that it is a mere pretext for a discriminatory hiring decision. *Id.*

#### A. *"Pursuant to" an Affirmative Action Plan*

██ Before addressing the validity of Chrysler's affirmative action plan, the Court first considers whether Chrysler's rejection of Frost's application was, in fact, pursuant to that plan. Title VII and Section 1981 generally protect white persons as well as minorities from racial discrimination in employment. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). Employers are permitted to give preferential treatment to racial minorities pursuant to valid, voluntary affirmative action plans. *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

Chrysler's voluntary affirmative action plan apparently consists of both the MDDP, a training program limited to certain minorities, and the Fair Share Agreement with its so-called right of first refusal. Although Chrysler relies in part upon the MDDP as its affirmative action program, there is no evidence that Frost was rejected for the dealership because she hadn't completed the MDDP training program. The undisputed evidence shows that Frost was fully qualified for the position by virtue of her work experience, and that the MDDP training program is not a prerequisite to the position she sought. In fact, the MDDP program entered into Chrysler's hiring decision only insofar as the Fair Share Agreement's right of first refusal was exercised on behalf of a black

MDDP graduate. The MDDP program does not guarantee its graduates a dealership position, and did not in this case necessitate or justify the rejection of Frost's application. No evidence before the Court even suggests that Frost was rejected "pursuant to" the MDDP program.

The other aspect of Chrysler's affirmative action program, i.e., the right of first refusal, is more closely linked to Chrysler's rejection of Frost's application. At the time Frost applied, the Chrysler Black Dealer's Association[35] had first claim over any MIP dealership with an annual sales planning potential of 500 units or more.

Chrysler admits that when Frost applied, the Edmond Dodge dealership had a sales planning potential of 423 units. Mr. Ward, Chrysler's Director of Retail Development, who claimed the dealership on behalf of the Chrysler Black Dealers Association, admits that the dealership was "not technically" covered by the Fair Share Agreement or subject to right of first refusal.[36] Ward claimed the Edmond Dodge dealership because it had been operated by a black dealer previously, and because it was such a desirable dealership. Chrysler has also offered evidence that the dealership in fact sold more than 500 units during the year in question.

There is nothing in the 1989 Fair Share agreement which provides that a dealership which has once been operated by a black trainee must remain a black operated dealership once that dealer's relationship is terminated.[37] Nor does the Fair Share Agreement provide for the exercise of the right of first refusal based upon actual sales. Quite clearly nothing in the Fair Share Agreement, the MIP literature, or in any other document which Chrysler regards as part of its affirmative action plan, requires, authorizes or

---

**35.** The former Chrysler Black Dealer's Association is now known as the Chrysler Minority Dealers Association, and now has as members, persons of other minority races.

**36.** The Court notes that the Fair Share Agreement is not a binding contract. It provides, on page 11: "This document is intended to be a statement setting forth the breadth of Chrysler's commitment to the minority community. It is not a contract or legally binding document; nor

does it constitute an admission or concession by Chrysler that there is any inadequacy in minority group representation or participation within its organization."

**37.** Ward testified on deposition that once a black dealer leaves an MIP dealership, it doesn't automatically stay a black dealership, and that he must reassert the right of first refusal if he wishes to reserve it for another black dealer.

even contemplates the exercise of the right of first refusal over the Edmond Dodge dealership. Thus, even if Chrysler's right of first refusal were part of a valid affirmative action plan, Chrysler's decision to reject Frost's application was not made pursuant to such a plan.

## B. *Legitimacy of the Affirmative Action Plan*

▮▮▮▮ Race-conscious, voluntary affirmative action plans are permissible if they meet certain criteria. First, the plan must be justified by a conspicuous imbalance in traditionally segregated job categories; and second, the plan must not unnecessarily trammel the rights of the non-minority or create an absolute bar to their advancement. *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987).

### 1. Existence of a Conspicuous Imbalance

Chrysler has failed to show a manifest imbalance in a traditionally segregated job category, dealership owners, because it has failed to present evidence of the percentage of blacks in the population who are qualified for such positions. Chrysler expects its dealers to be qualified by "experience, aggressiveness and ability"[38] or to be "familiar with automotive retailing and ha[ve] a record of effective performance,"[39] and to also have the necessary capital resources to purchase such a dealership. Chrysler has produced no evidence from which the Court may compare the percentage of black persons possessing these qualifications with the percentage of dealerships owned by blacks. *See Johnson*, 480 U.S. at 632, 107 S.Ct. at 1451, 94 L.Ed.2d at 631 ("Where a job requires special training, however, the comparison should be with those in the labor force who possess the relevant qualifications.") Such a comparison is necessary to support a finding that a conspicuous imbalance exists.

Since the MDDP and the MIP address different concerns, (the MDDP addressing lack of training and experience, the MIP addressing lack of financial resources), Chrysler has the evidentiary burden of proving the existence of conspicuous racial imbalances separately. As in *Weber*, which involved a training program designed to provide expertise, Chrysler's evidence comparing the percentage of black-owned dealerships and the percentage of blacks in the general population, is arguably sufficient to support the MDDP insofar as it relates to blacks. However, Chrysler has failed to produce evidence showing that, among those persons who are otherwise qualified to own dealerships, a racial imbalance exists with respect to financial resources, or the ability to obtain the necessary capital to acquire dealerships. This latter comparison is necessary to support the application of the right of first refusal to MIP dealerships.

Chrysler's failure to present evidence of a racial disparity with respect to financial resources among those persons qualified by experience or training to own dealerships parallels Chrysler's failure to recognize that the privately capitalized and MIP dealerships must be viewed separately because of marked differences between the two. There are critical distinctions between the privately owned, privately capitalized businesses which sell Chrysler's products, and Chrysler's own MIP dealerships, which are wholly or partially owned by Chrysler, are capitalized by Chrysler, and are operated and managed by Chrysler employees. While blacks may be underrepresented among the independent entrepreneurs who own their own dealerships, blacks comprise approximately 55 percent of all MIP dealers in the Chrysler-owned dealerships, and 100 percent of all MIP dealers in the multi-state Kansas City zone.

While it is true that Chrysler may justify the adoption of an affirmative action plan without showing a conspicuous imbalance among its own employees, Chrysler must show a conspicuous imbalance in the particular job category. *Johnson v. Transportation*

---

38. MIP brochure, p. 2.

39. MDDP brochure, p. 5.

*Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). In this case, Chrysler is attempting to remedy a conspicuous imbalance in one job category (privately capitalized dealership owners) by implementing an affirmative action plan in another (MIP dealers).[40]

Chrysler asserts that it established the MIP program, among other reasons, to ensure that dealerships remain open in targeted market areas at times when independent, private capital ownership is not otherwise available.[41] Had Chrysler presented evidence that dealerships were placed in the MIP program because there were no qualified candidates in the market area who had sufficient financial resources for private capitalization, a stronger case might have been made for treating the MIP and privately owned dealerships together rather than separately. Chrysler has submitted no evidence of how certain dealerships came to be MIP dealerships, and thus subject to the right of first refusal.[42] In the absence of such evidence, the MIP and privately owned dealerships must be treated separately for purposes of determining whether a manifest racial imbalance exists, and whether the plan unnecessarily trammels the interests of whites, or creates an absolute bar to the advancement of whites.

### 2. Purpose of the Plan, Attaining a Balanced Work Force

Voluntary affirmative action plans may be utilized to attain, but not to maintain, a balanced work force. *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729, 61 L.Ed.2d at 492. In determining whether Chrysler's plan was intended to obtain a balanced work force, and not to maintain one, the Court assumes that the rejection of Frost's application was "pursuant to" Chrysler's affirmative action plan. The Court has little doubt that both the MDDP and the right of first refusal were *intended* to correct an imbalance in black-owned dealerships. However, because the MIP dealerships are very different from and more attractive than the privately owned dealerships, and because the right of first refusal applies only to the MIP dealerships, the MIP dealerships must be viewed separately. Thus, the issue of whether the plan was designed to and actually operates to achieve rather than maintain a racial balance must be determined with reference to the MIP dealerships only. Fifty-five percent of Chrysler's MIP dealers are black, as opposed to approximately twelve percent of the general population. The use of even the most carefully drafted affirmative action plan to increase the number of black MIP dealers would not further the permissible goal of achieving a balanced work force. To the contrary, the right of first refusal clearly operates to maintain rather than achieve a percentage of black MIP dealers which far exceeds the percentage of blacks in the general population.

### 3. Unnecessarily Trammeling the Interests of Whites

Chrysler argues that its affirmative action program does not unduly trammel the rights

---

**40.** Over a period of approximately five years, the MIP dealers buy out Chrysler's ownership interest, and eventually own the dealership. During the "buy out" years, the MIP dealer is paid a salary of at least $66,000 per year by the Chrysler corporation. Chrysler also provides the dealer with a car, which is attributed to the dealer as income.

**41.** *See* Defendant's Motion for Summary Judgment, Statement of Material, Undisputed Facts at Par. A3, and MIP brochure at pp. 11–12.

**42.** Indeed, it appears that the right of first refusal may be utilized not only *after* a dealership is placed in the MIP program because a qualified candidate with adequate capital cannot be found, but may be exercised to convert any and all dealerships which are for sale and which have a "planning potential" of 500 units or more to black dealerships. *See* Affidavit of Cecil Ward at Par. 3 and Exhibit "A" thereto at pp. 1–2. ("All available locations (open points) and dealerships for sale with Planning Potentials of 300 [now 500 per Fair Share Agreement] units and above will be offered to qualified minorities on a *Right of First Refusal* basis"; "all current and future provisions open points ... certified by Market Representation with Planning Potentials of 300 [now 500] or more units" ... "All future Buy–Sell and replacement opportunities for existing provisioned dealerships with Planning Potentials of 300 [now 500] or more units." In other words, it appears that the rights of first refusal may be utilized to set aside for blacks all available dealerships having a sales planning potential of 500 units or more.

of whites [43] because white applicants have the option of pursuing a privately capitalized dealership. This argument is unsupported by any evidence that otherwise qualified white persons ordinarily have the requisite financial resources to capitalize a dealership. Moreover, the theoretical possibility that a white person might purchase a privately capitalized car dealership does not adequately protect the legitimate interests of whites from the harsh impact of the right of first refusal for several reasons. First, the privately capitalized dealerships are not reasonably comparable to, and are less attractive than the MIP dealerships.[44] Furthermore, Chrysler makes no attempt to show that private capitalization is a realistic option for most qualified white candidates. It cannot be simply presumed that a white candidate will be able to invest the funds (approximately one million dollars) [45] necessary to obtain a privately capitalized dealership. Chrysler's argument, when reduced to its simplest terms, demonstrates just how severely its right of first refusal trammels the interests of whites. Chrysler argues, in essence, that it may exclude qualified white persons from consideration for employment in a company dealership because whites can simply buy their own businesses.

Chrysler also contends that white applicants have the option of applying for one of the smaller MIP dealerships which are not eligible for the right of first refusal, i.e., a dealership with a sales planning potential of fewer than 500 units. The availability of this option also does little to minimize the discriminatory impact of the right of first refusal and the MDDP. First, Chrysler describes these smaller dealerships as "likely doomed to failure," which is the reason that minorities are not placed in them. Second, at the time Mary Frost applied, no such dealerships were available in the entire multi-state Kansas City zone.[46] Finally, in practice, Chrysler has applied the right of first refusal even to dealerships of fewer than 500 units.

The right of first refusal, utilized in conjunction with or independently of the MIP program, unnecessarily trammels the rights of white candidates who are otherwise qualified. The right of first refusal permits the Chrysler Black Dealers Association to set aside for blacks as many as all available dealerships (or at least all MIP dealerships) having a sales planning potential of 500 units or more. It may be inferred from the evidence that non-black qualified candidates are barred from consideration even when there are no qualified black candidates.[47]

Frost's evidence also shows that "legitimate and firmly rooted expectations" of qualified dealer candidates are unsettled by Chrysler's affirmative action plan. Chrysler admits that Frost was qualified to become an MIP dealer, and that she was the only qualified candidate for the Edmond Dodge dealership when she applied and for six months thereafter. Nevertheless, Frost was reject-

---

43. Since the parties in this case have thus far focused upon the impact of Chrysler's right of first refusal, the Court's opinion addresses the issue of whether the refusal right unnecessarily trammels the interests of whites. The Court observes, however, that the right of first refusal appears to have the potential for unduly trammeling the interests of other non-black persons, even where those persons are members of some other identifiable, disadvantaged group, such as non-black females.

44. The privately capitalized dealers are paid no salary by Chrysler and are not employed by Chrysler. The privately capitalized dealerships generally require an initial capital investment of approximately one million dollars. The MIP dealerships do not initially require a capital investment, but do usually require approximately $65,000.00 in unencumbered funds to be placed in escrow for possible investment at a later time.

45. Deposition of Joseph J. Shady, June 30, 1992, pp. 50–51.

46. The Defendant points out that candidates for MIP dealerships are expected to be willing to relocate *if necessary*. Since Frost lived in the geographic area, and no other qualified candidate did live in the geographic area, it cannot be inferred that relocation was necessary.

47. Although the Court concludes that Chrysler's rejection of Frost's application was not "pursuant to" the right of first refusal, because the Edmond Dodge dealership was not subject to the right, the right was nevertheless asserted as to that dealership. Thus, it may be inferred that the Chrysler affirmative action plan permits the exercise of the refusal right as to dealerships subject to it even where there are no qualified black candidates and there are qualified non-black candidates.

ed as a dealer for an existing MIP dealership.

The evidence further shows that the right of first refusal may be utilized to completely bar qualified white candidates from MIP dealerships with a planning potential of 500 units or more.[48] In contrast to a program such as in *Johnson,* in which gender was permitted to be considered as a "plus factor," Chrysler's right of first refusal can be utilized to completely preclude consideration of qualified non-blacks for MIP dealerships, even when there are no qualified black candidates.[49]

In summary, the evidence shows beyond doubt that white applicants have no meaningful opportunity to compete for the dealership positions made available to black applicants through the marketing investment program. Moreover, the right of first refusal is not limited to any specific period of time, nor does it expire upon achievement of any particular goal. Although Chrysler contends that it is a temporary measure, Chrysler offers no suggestion as to when or under what circumstances it might be discontinued.

### C. *Pretext*

■ Having concluded that Chrysler's plan is not a valid affirmative action plan, the Court need not reach the issue of whether the plan, as applied in this case, is a mere pretext for racial discrimination. The Court notes, however, that Frost's evidence very strongly suggests that the Plan, as applied by Chrysler in this case, was a mere pretext for racial discrimination. The use of an otherwise valid affirmative action plan as a mere pretext for a hiring decision improperly motivated by racial animus is prohibited, and when a plaintiff demonstrates the absence of a manifest imbalance between the job at issue and the available work force, the use of an affirmative action program may be pre-

sumed to be pretextual. *Jaworski v. Cheney,* 771 F.Supp. 109 (E.D.Pa.1991).

The evidence in this case strongly suggests that Chrysler's affirmative action program was a mere pretext for rejecting the application of the Plaintiff, a white female. As noted above, the "right of first refusal" upon which Chrysler based its decision to reject Frost's application is not even applicable to the dealership for which she applied. Furthermore, the person who exercises the right of first refusal on behalf of the Chrysler Black Dealers Association is a Chrysler employee and is in fact the person in charge of minority dealer development for Chrysler. Moreover, the position remained unfilled for an extended period of time until a black applicant was found to fill it.

### III.

### CONCLUSION

The Plaintiff's Motion for Summary Judgment is hereby **GRANTED** with respect to the issue of liability. Defendant's Motion for Summary Judgment is hereby **DENIED.**

**IT IS SO ORDERED.**

---

48. As "applied" in this case, the right of first refusal was utilized to completely bar a qualified non-black candidate from consideration for a dealership with a planning potential of fewer than 500 units.

49. In approving the consideration of gender as a "plus factor," the Supreme Court in *Johnson*

noted that the challenged plan set aside no positions for women, that the plan's "goals" could not be construed as mandatory quotas, and that sex was only one of numerous factors taken into account in the Defendant's hiring decision. 480 U.S. at 637, 638, 107 S.Ct. at 1454, 1455, 94 L.Ed.2d at 634, 635.