Jeffrey SIMON, Plaintiff,

v.

AMERICAN POWER CONVERSION CORPORATION, Rodger B. Dowdell, Jr., Edward W. Machala, Asa S. Davis, III, Neil E. Rasmussen, and David P. Vieau, Defendants.

Craig MASON, Plaintiff,

v.

AMERICAN POWER CONVERSION CORPORATION, Rodger B. Dowdell, Jr., Edward W. Machala, Asa S. Davis, III, Neil E. Rasmussen, and David P. Vieau, Defendants.

Lynn D. LEWIS and Jeffrey S. Steinberg, Plaintiffs,

v.

AMERICAN POWER CONVERSION CORPORATION, Rodger B. Dowdell, Jr., Edward W. Machala, Asa S. Davis, III, Neil E. Rasmussen, and David P. Vieau, Defendants.

Norma LOHNER, Delta Dental Plan of Illinois, Harold Martin, Administrator, and Raphael Eshet, Plaintiffs,

v.

AMERICAN POWER CONVERSION CORPORATION, Rodger B. Dowdell, Jr., Edward W. Machala, Asa S. Davis, III, Neil E. Rasmussen, and David P. Vieau, Defendants.

FRIENDS OF CHABAD LUBAVITCH, INC., Plaintiff,

v.

AMERICAN POWER CONVERSION CORPORATION, Rodger B. Dowdell, Jr., Edward W. Machala, Asa S. Davis, III, Neil E. Rasmussen, and David P. Vieau, Defendants.

C.A. Nos. 95–415 L, 95–416 L, 95–423 L, 95–426 L and 95–428 L.

United States District Court, D. Rhode Island.

Nov. 13, 1996.

418

Barry J. Kusinitz, Corrente, Brill & Kusinitz, Providence, RI, David A.P. Brower, Wolf Haldenstein Adler Freeman & Herz L.L.P., New York City, for plaintiffs in C.A. Nos. 95–415, 95–416, and 95–428.

William A. Jacobson, Kaplan & Jacobson Inc., Providence, RI, Bernard M. Gross, Deborah R. Gross, Philadelphia, PA, Stuart H. Savett, Robert P. Frutkin, Barbara A. Podell, Katherine M. Ryan, Savett, Frutkin, Podell & Ryan, Philadelphia, PA, James Orman, Philadelphia, PA, for plaintiff in C.A. No. 95–423 (Lewis).

Robert J. McConnell, Ness, Motley, Loadolt, Richardson & Poole, Providence, RI, Richard Weiss, Milberg Weiss Bershad Hynes & Lerach, New York City, for plaintiff in C.A. No. 95–426 (Lohner).

Matthew F. Medeiros, Medeiros Karmen & Sanford, Inc., Providence, RI, Eric A.

Deutsch, Jorda D. Hershman, Testa Hurwitz & Thibeault, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This case involves securities law claims brought against American Power Conversion Corporation ("APC") and individual officers and directors of APC ("the Individual Defendants")[1] in five related cases.[2] Plaintiffs allege that APC committed "fraud on the market" by making a series of public statements from April to July 1995 that were either materially misleading in and of themselves, or incomplete and misleading due to the omission of material facts, in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Plaintiffs also assert that certain Individual Defendants sold their APC shares while in possession of material non-disclosed information, in violation of section 20A of the Securities Act. The matter is presently before the Court on defendants' motion to dismiss pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. For the reasons that follow, that motion is granted in part and denied in part.

## I. Background

The following facts are not in dispute, unless otherwise noted. APC designs, manufactures, and markets uninterruptable power supply ("UPS") products, which prevent disruptions in the power supplied to computers and the loss of data caused by such interruptions. Sometime in April 1995, APC discovered that a component defect had affected a number of its UPS products. The defect caused the malfunction of a number of products that had already been shipped to customers, leading to increased product returns. Moreover, upon discovery of this defect, APC

was allegedly forced to temporarily suspend production and shipment of some UPS products until the problem could be remedied. While exact dollar amounts have not been given to the Court, it is clear that APC had some amount of rework expenses, lost sales, and increased inventories as a result of the defect.

APC chose not to disclose the defect or to publicly acknowledge the additional costs associated with it until July 27, 1995, in a press release announcing the company's second quarter financial results. While the release noted record sales for the quarter, earnings fell short of APC's projections, primarily due to the costs associated with the defect. The stock market reacted negatively, as APC's per share price dropped from $22–3/8 to $18–3/8 on July 28, the day after the announcement of the defect. The slide continued over the next week, with APC's stock price closing at $16–1/4 on August 3.

The timing of APC's announcement of the defect, and the possible motivations for the company's timing, is what has brought this matter before the Court. In public statements subsequent to the July 27 press release,[3] APC acknowledged that it knew about the defect sometime in April, when malfunctioning UPS products were first returned to the company. According to APC, the defect was not disclosed before July 27th because the company could not quantify the costs associated with the defect, or know if such costs would be material, until after the close of the second quarter.

The plaintiffs, however, attach a more sinister motivation to APC's decision to delay announcement of the defect. According to the complaint, APC's management chose to delay disclosure in order to maintain the

---

1. The Individual Defendants are Rodger B. Dowdell, Jr. (CEO and Chairman of the Board of APC), Edward W. Machala (Vice President, Treasurer, and Head of Operations), Neil E. Rasmussen (Vice President and member of the Board of Directors), David P. Vieau (Vice President of Marketing), and Asa S. Davis, III (Vice President of Sales through May 1, 1995).

2. Plaintiffs initially filed five separate complaints against APC and the Individual Defendants in August 1995. These actions were later consoli-

dated, and a Consolidated Amended Class Action Complaint was filed in December 1995.

In a prior Order in this matter, the Court decided to allow the plaintiffs to postpone filing a motion to certify the class until after the resolution of the present motion to dismiss. As a result, while the complaint was filed as a class action, as of yet the class has not been certified.

3. These statements were reported in a *Wall Street Journal* article of August 2 and a *Providence Journal–Bulletin* article of August 3, 1995.

strength of the company's stock price, protecting not only the financial health of the company, but also a number of APC officers and directors who owned APC stock. To support this contention, plaintiffs point to the fact that four of the five Individual Defendants sold $11 million worth of their APC stock between May 19 and June 23,[4] allegedly while aware of the defect and the accompanying costs.

Plaintiffs further assert that APC went beyond simple nondisclosure, pointing to a series of public statements in which APC allegedly misrepresented the company's condition in order to conceal the defect from the investing public. The complaint maintains that these statements, made between April 24, 1995 and July 27, 1995 ("the Class Period"), were misleading to the named plaintiffs and other investors who purchased APC stock during the Class Period. Specifically, plaintiffs highlight six instances where APC is alleged to have made misleading public statements. The following summarizes the relevant portions of each of the challenged statements, as well as the plaintiffs' arguments concerning how each statement was misleading.

### (1) *First Quarter Earnings Announcement*

On April 24, APC announced record first quarter sales and earnings in a press release reported by *PR Newswire*. CEO Rodger Dowdell credited these record figures to "improving manufacturing efficiencies" in APC's new Galway, Ireland and Fort Meyers, Florida plants. Additionally, Dowdell stated that although these new plants were "still on the learning curve, we do feel operations in these facilities are heading towards more traditional levels of efficiency." Dowdell further noted that APC "has good opportunities to expand its products offering ... and we expect 1995 to be a busy year."

Plaintiffs allege that APC and Dowdell had knowledge of the defect at the time of the

release, even though the release makes no mention of APC's discovery. Thus, plaintiffs assert that the April 24 release is misleading because, at that time, APC knew that remedying the defect would slow down production, thus rendering the company's move towards "more traditional levels of efficiency" impossible in the short term.

### (2) *Financial Analysts' Reports*

Securities analysts following APC issued a number of reports on the company during the Class Period. Smith Barney and Paine Webber issued reports on April 26 and 27, respectively. While each report noted increases in APC's inventories beyond the company's normal levels, the analysts concluded that the inventory position was not a concern for APC. According to the Smith Barney report:

> In conversations related to inventory control and management issues, the company has specifically noted the necessity of maintaining relatively high levels of battery inventories given issues related to cost ... transit time and lack of supply reliability.
>
> . . . .
>
> APCC has made a strategic decision to not lose sales as a result of out-of-stocks, and has reiterated their position numerous times. The cost of that position has and should continue to be higher inventory levels.

Similarly, Paine Webber dismissed its inventory concerns, noting that APC was "building for peak summary demand and is worried over component shortages; therefore it is stockpiling raw materials." Smith Barney issued a second report on May 11, after analysts visited the APC facility in Galway, Ireland. According to this report, the visit confirmed the conclusions reached in the earlier reports regarding APC's inventory position.[5]

---

**4.** The share prices for these sales ranged from a low of $16–5/8 on May 19 to a high of $24–3/4 on June 23, with the majority of the insider shares selling at just over $20 per share.

**5.** "Having inspected raw material and finished goods inventories at the plant, it would seem that

the levels and compositions of those inventories are wholly consistent with previous information provided to us by APCC, and with our previous (lengthy) comments on the subject of corporate inventories."

Plaintiffs assert that these reports misrepresented the true nature of APC's inventory problem. Plaintiffs allege that the true reason for the inventory buildup was the component defect: product inventories were high because products had been returned and shipments had been suspended, while raw material inventories rose due to a slowdown in production while the defect was corrected. Plaintiffs further contend the APC management caused these misrepresentations by first providing the analysts with the alternative (and false) explanations for the inventory increases cited in the reports, and then by concealing the production slowdown from the analysts during the visit to the Galway plant.

### (3) *APC's First Quarter SEC Form 10–O Filing*

Filed on May 12, 1995, the 10–Q report set out APC's financials for the first quarter of 1995, without making any note of the discovery of the component defect. The report also commented on the inventory concerns cited above: "The increase in inventory levels has been needed to support the growth in the Company's sales volume, as well as the need to increase the carrying levels of raw materials, in-process assemblies and finished stock as a result of major new products introduced during the fourth quarter of 1994."

Plaintiffs aver that by the time the 10–Q was filed, the defect had already caused the company's inventories to swell. Thus, even assuming that the comment on inventories was accurate as to the first quarter, plaintiffs contend that APC had knowledge about the then-current inventory position that, if disclosed, would have given the market the most accurate and complete picture of the company's operations as of the date of the 10–Q filing.

### (4) *June 2 Press Release*

Plaintiffs assert that a statement by CEO Dowdell in a June 2 press release was misleading. In announcing the appointments of new Vice Presidents for Marketing and Worldwide Business Development, Dowdell stated that APC "recognize[s] the significance of newly emerging international markets and the vast potential for the company's products in these areas of the world." Plaintiffs claim that the reference to international markets was misleading in that Dowdell fails to note that APC's international operations was the segment of the company most affected by the component defect.

### (5) *APC's Annual Meeting of Shareholders*

Plaintiffs assert that a number of misleading statements were made by CEO Dowdell during APC's annual shareholder meeting, held on June 14, 1995.[6] Dowdell stated that his company was "gaining market share, we are gaining momentum, and our revenues are strong." Stressing the company's strong competitive position, Dowdell stated that APC had a "global focus that many of our competitors do not," and asserted that APC was "now outshipping [a competitor] by as much as 460 to 1." In addition, when faced with questions from shareholders and analysts about APC's inventory position, Dowdell reportedly reiterated the need to maintain overstocks in order to meet swelling demand.[7]

Plaintiffs maintain that these statements were misleading in two respects: first, this is cited as yet another example of APC offering false explanations for the inventory buildup caused by the defect. Second, plaintiffs assert that it was misleading to discuss product shipments without disclosing that shipments were temporarily suspended due to the defect.

---

**6.** Plaintiffs have quoted Mr. Dowdell's statements from a June 15, 1995 *Providence Journal–Bulletin* article reporting on the shareholder meeting.

**7.** The Court notes, in passing, that in framing their complaint, plaintiffs seem to have developed a habit of placing quotation marks around statements and then attributing same to APC or

its officers, where the statements so attributed are in fact no more than the conclusions reached or summary provided by a newspaper reporter or a securities analyst. Instead of highlighting each instance here, the Court simply suggests that plaintiffs find a way to break themselves of this habit.

*(6) July 3 HFN Article*

Finally, plaintiffs highlight certain statements in a July 3 article in *HFN*, the weekly newspaper for the Home Furnishing Network. The article notes that APC had stepped-up production of its UPS products in anticipation of the release of Windows 95 and the accompanying increase in computer sales, a conclusion that the writer apparently based on a conversation with APC product manager Andrew Kallfelz. According to plaintiffs, the assertion that production had been "stepped up" simply cannot be truthful in light of the production shutdown caused by the defect.

Plaintiffs contend that these alleged misrepresentations artificially inflated the market price for APC stock, and that they were injured when they purchased APC stock at the inflated prices. As a result, plaintiffs brought the present action on behalf of themselves and others similarly situated, claiming that APC has committed a fraud on the market in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the regulations promulgated thereunder. Plaintiffs have also asserted claims against the Individual Defendants based on these same statements under the controlling persons liability of § 20(a) of the Securities Act. Finally, insider trading claims were brought against certain Individual Defendants who sold APC stock contemporaneously with plaintiffs during the Class Period, under § 20A of the Act.

APC and the Individual Defendants filed a motion to dismiss with prejudice all claims against them, asserting that the complaint failed to state a claim under Rule 12(b)(6) and failed to plead fraud with particularly as required by Rule 9(b) of the Federal Rules of Civil Procedure. After hearing arguments on the motion, the Court took the matter under advisement. It is now in order for decision.

## II. Discussion

In ruling on a motion to dismiss, the Court construes the complaint in the light most favorable to plaintiffs, taking all well-pleaded allegations as true and giving plaintiffs the benefit of all reasonable inferences. *See Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987). Dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Because this case involves allegations of fraud, the Court's determination of the legal sufficiency of the complaint is further governed by Rule 9(b), which requires "the circumstances constituting fraud or mistake [to be] stated with particularity." Fed.R.Civ.P. 9(b).

## A. Section 10(b) Claims

Section 10(b) of the Exchange Act, together with Rule 10b–5 of the regulations promulgated thereunder, prohibit any person, directly or indirectly, from committing fraud in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b);[8] 17 C.F.R. § 240.10b–5.[9] To state a claim for securities

---

**8.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

 . . . .

 (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j (1994).

**9.** It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumen-

tality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1996).

fraud under these sections,[10] a plaintiff must plead, with sufficient particularity to satisfy Rule 9(b), that a defendant made a materially false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement caused the plaintiff's injury. *See Basic Inc. v. Levinson,* 485 U.S. 224, 241–43, 108 S.Ct. 978, 988–90, 99 L.Ed.2d 194 (1988); *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1217 (1st Cir.1996). Reliance is presumed in a "fraud on the market" case such as this one, as the price of the stock, which reflects all information available in the market, is taken to be the basis of the investment decision. *See Basic,* 485 U.S. at 243–44, 108 S.Ct. at 989–90; *Shaw,* 82 F.3d at 1218.

The Court considers first the question of materiality. Whether information is "material" under § 10(b) is determined under the "reasonable investor" standard: whether a reasonable investor would have viewed the nonpublic information as "having altered the total mix of information made available" to those making the investment decision. *See Basic,* 485 U.S. at 231–32, 108 S.Ct. at 983–84. In the present case, plaintiffs assert that the discovery of a defective component was a material fact that should have been disclosed to the investing public.

The issue of materiality is generally one that is left for the trier of fact, *see Lucia v. Prospect Street High Income Portfolio, Inc.,* 36 F.3d 170, 176 (1st Cir.1994), and the Court will not upset that balance here. Reasonable investors could very well find information regarding a defect important in making the decision of whether to buy APC stock. The added costs associated with remedying a defect—rework expenses, production shutdowns, shipment delays, and possible loss of goodwill—can all affect a company's bottom line, and in turn change the expected return on an investment. Indeed, the negative reaction of the stock market to the eventual disclosure of the defect is itself an indicia of materiality. *See S.E.C. v. MacDonald,* 699 F.2d 47, 49–50 (1st Cir.1983) (en banc). Thus, the Court cannot conclude as a matter of law that reasonable investors would not have considered the discovery of the defect material information.

The fact that a corporation was in possession of material nonpublic information is not enough to sustain a § 10(b) claim, however. No matter how "material" undisclosed information might be, the securities laws are not implicated unless there was first a duty to disclose this information. *See Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996); *Roeder,* 814 F.2d at 26. One instance where such a duty to disclose arises is where a corporate insider trades on confidential information. *See Chiarella v. United States,* 445 U.S. 222, 225–30, 100 S.Ct. 1108, 1113–16, 63 L.Ed.2d 348 (1980); *Roeder,* 814 F.2d at 26. In addition, a duty to disclose also arises where a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information. *See Summa Four,* 93 F.3d at 992; *Roeder,* 814 F.2d at 26 ("When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate.").

In light of these precedents, the Court turns to the § 10(b) claims asserted against APC. Of course, as plaintiffs recognize, the simple possession of nonpublic information is insufficient to support a claim under this section. However, plaintiffs allege more than some general or abstract duty to disclose; instead, they maintain that APC's duty to disclose the defect was indeed triggered in this case. Invoking both of the disclosure rationales cited above, plaintiffs contend that APC was under a duty to disclose because: (1) APC insiders sold shares while aware of nonpublic information; and, (2) APC made public statements during the Class Period which were misleading in light of the nonpublic information. The Court will examine each of these grounds in turn to determine whether APC was under any duty to disclose its discovery of the defect.

---

**10.** The Supreme Court recognized a private cause of action for those injured by violations of SEC rule 10b–5 in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 728–31, 95 S.Ct. 1917, 1921–23, 44 L.Ed.2d 539 (1975).

*Trading by APC Insiders*

■ The Court can dispense with plaintiffs' first argument in relatively short order. The duty to disclose triggered by insider trading is commonly known as the "disclose or abstain" rule, which prohibits an individual corporate insider from trading on inside information unless he first makes public disclosure. *See Chiarella,* 445 U.S. at 228–29, 100 S.Ct. at 1114–15; *MacDonald,* 699 F.2d at 50. While this version of the duty to disclose most often is invoked in cases of insider trading by *individuals,* the disclose or abstain rule has been applied to corporations as well: a corporate issuer, in possession of material undisclosed information, may not issue or otherwise trade in its own stock unless it first discloses this information to the market. *See Shaw,* 82 F.3d at 1203–04; *see also Rogen v. Ilikon Corp.,* 361 F.2d 260, 268 (1st Cir.1966). Thus, "a corporation trading in its own securities [is] an 'insider' for purposes of the 'disclose or abstain' rule." *Shaw,* 82 F.3d at 1203.

■ In the present case, the alleged insider trading by the Individual Defendants, if proven, would certainly trigger a duty to "disclose or abstain" on the part of the *individuals.* This is not the claim pursued by plaintiffs here, however. Instead, plaintiffs assert that any insider trading by *individuals* at APC triggered a duty to disclose on the part of the *corporation.* The Court cannot agree with this contention. The First Circuit has never ascribed a duty to disclose to a corporation on the basis of an individual's insider trading. Moreover, plaintiffs have been unable to cite any authority for the proposition they advance; indeed, the courts that have considered this issue have rejected plaintiffs' contention. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 813–14 (2d Cir.1996) (dismissing § 10(b) claims as against corporation based solely on insider trading of individual); *In re Seagate Technology II Sec. Litig.,* 843 F.Supp. 1341, 1369–70 (N.D.Cal.1994); *Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1518 (N.D.Cal.1990). Therefore, as it is not alleged that APC itself issued or traded in its own securities during the Class Period,[11] the Court will not impose a duty to disclose on the company under an insider trading rationale.

■ Moreover, the rationale which underlies the "disclose or abstain" rule is not implicated by plaintiffs' claims against APC. The central justification for the disclose or abstain rule is to prohibit "inside" traders— whether individuals or corporations—from exploiting their informational advantage to profit at the expense of investors. *See Shaw,* 82 F.3d at 1203–04. The claims advanced here against APC, however, are founded on an entirely different theory, fraud on the market—a theory that springs from an entirely different rationale: compensating market participants for artificial boosts or deflations in stock prices caused by material misrepresentations. *See Basic,* 485 U.S. at 241–47, 108 S.Ct. at 988–92; *Shaw,* 82 F.3d at 1218. In essence, plaintiffs are asking the Court to import a disclosure obligation founded on insider trading principles into the fraud on the market context. The Court refuses plaintiffs' invitation, as to do so would in no way advance the market-correction concerns that drive the fraud on the market rationale. *See In re Seagate,* 843 F.Supp. at 1369–70 (noting impropriety of importing disclosure obligations from insider trading context to fraud on the market case).

*APC's Public Statements*

Plaintiffs further assert that APC was under a duty to disclose because it made public statements that were either false in and of themselves, or false, incomplete, or misleading in light of the nondisclosed information concerning the defect. These statements, carried in press releases, newspaper articles, and trade journal reports, make up the heart of plaintiffs' case against APC.

The Court recognizes that three recent First Circuit securities law decisions bear directly on the issues presented by plaintiffs, *Gross v. Summa Four, Inc.,* 93 F.3d 987 (1st Cir.1996), *Glassman v. Computervision*

---

**11.** If anything, it could be said that APC *abstained* from trading in its own securities during the Class Period, and thus fulfilled its obligations under the "disclose or abstain" rule.

*Corp.*, 90 F.3d 617 (1st Cir.1996), and *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir.1996). While these decisions addressed a wide array of securities law claims, common to each case was a claim that a public statement or disclosure by a corporation triggered a duty to disclose additional nonpublic information in order to make the prior statements complete and accurate.[12] As the same questions are presented by plaintiffs here, the Court cannot consider the present motion without first discussing these recent First Circuit precedents.

The first and most significant of the recent decisions is *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir.1996). In *Shaw*, a class of investors who purchased Digital stock in a 1994 public offering asserted that certain material facts concerning the company's operations and financial position had been omitted from the registration statement and prospectus filed in preparation for the public offering,[13] in violation of the disclosure requirements of sections 11 and 12(2) of the Securities Act of 1933. *See id.* at 1201–06. In addition, a second class of investors, those who had purchased Digital stock in the secondary market, claimed that a series of optimistic statements made by the company in the period leading up to the offering had artificially inflated the price of the stock,[14] thus working a "fraud on the market" in violation of section 10(b) of the Securities Exchange Act of 1934. *See id.* at 1216–17.

Of special relevance here is the First Circuit's resolution of the fraud on the market claims brought by the investors who had purchased stock in the secondary market. In evaluating the actionability of the "fraudulently optimistic" public statements, the Court suggested that the nature and rationale of fraud on the market cases required courts to refocus their attention on the question of materiality. For fraud on the market cases:

> [The] presumption of investor reliance on the integrity of stock prices has the primary effect of obviating the need for plaintiff purchasers to plead individual reliance. But by its underlying rationale, the presumption also shifts the critical focus of the materiality inquiry. *In a fraud-on-the-market case the hypothetical "reasonable investor," by reference to whom materiality is gauged, must be "the market" itself, because it is the market, not any single investor, that determines the price of a publicly traded security.*
>
> Thus, a claim that a fraud was perpetrated on the *market* can draw no sustenance from allegations that defendants made overly-optimistic statements, if those statements are ones that any reasonable investor (ergo, the market) would easily recognize as nothing more than a kind of self-directed corporate puffery. The market is not so easily duped, even granted that individual investors sometimes are.

*Shaw*, 82 F.3d at 1218 (citations omitted) (emphasis added).

The Court thus found that the public statements challenged by the investors were immaterial as a matter of law. In the Court's view, a CFO's statements that his company "should show progress quarter over quarter, year over year," or that he was "confident that [Digital] was pursuing the right strategy" were really no more than corporate puffery, the now-customary sales talk that the

---

**12.** The statements alleged to have triggered a duty to disclose additional information were issued through a variety of media, including press releases, letters to shareholders, newspaper articles, and securities registration statements. *See Summa Four*, 93 F.3d at 990 (press releases, letter to shareholders); *Computervision*, 90 F.3d at 621 (prospectus); *Shaw*, 82 F.3d at 1216–1222 (press releases, newspaper articles, registration statement).

**13.** Specifically, plaintiffs asserted that the SEC filings should have included information concerning: (1) the company's new and risky marketing strategy, (2) double payments being paid to sales representatives, which cut into profit margins, and (3) the company's upcoming (and disappointing) operating results. *See Shaw*, 82 F.3d at 1206–11.

**14.** In addition, the investors also claimed that the material misleading statements in the prospectus themselves artificially inflated that market price of the stock. *See id.* at 1221–22. As for the optimistic public statements, examples of these included a CFO's assertion that Digital was "a very healthy company" that was "basically on track," and that sales of its new products were "going reasonably well." *See id.* at 1219.

market realizes should not be taken too seriously, and thus could not, as a matter of law, artificially inflate the market price. *See id.* at 1217–19. The Court viewed the CFO's statements in the same light as the "sales talk" or "puffing" that is insufficient to support a common law fraud claim:

> [A] certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace— loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.

*Id.* at 1217 & n. 32.

Under a similar rationale, the Court found that other statements, which could not be characterized as mere puffery, were also nonactionable in light of the context in which the statements were made. Digital had made statements to the effect that the company anticipated "breaking-even" in the upcoming quarter, when in reality the company realized (and allegedly anticipated) losses in that quarter. *See id.* at 1219–21. The statements went beyond mere expressions of opinion or optimism, since in isolation they seemed to provide "hard facts" about the company's bottom line. However, stressing the importance of context, the Court found that the market (as the reasonable investor) would not have attached too much significance to these comments. The Court cited other comments reported in the same articles as the "break-even" statements, as well as the overall cautious and skeptical tenor of the articles in which the statements were reported, as sufficient to tip-off the market to the fact that the "break-even" statements should not be read as a material comment on the company's financial position.[15] Since the market would not have taken these statements too seriously, the statements could not have inflated the market price; thus, the

statements were immaterial and not actionable. *Id.*

■ While *Shaw* was principally a misrepresentation case, it is clearly instructive for duty to disclose cases as well. If a statement is not of a nature that would be considered material by the market—for instance, because it was mere sales talk—then that statement cannot be sufficient to trigger a duty to disclose additional facts. Whether the case involves a direct misrepresentation or an omitted fact, therefore, the key inquiry is the same: was the market price of the stock artificially inflated, i.e., was there a fraud on the market? In other words, because a company is under no *initial* duty to disclose material nonpublic information, a court should not impose such a duty unless the company has affirmatively *done* something (such as issue an incomplete or misleading public statement) that has had an artificial effect on the market price; to hold otherwise would force a company to reveal information that will influence the stock price, when the company has done nothing to artificially affect that price.

■ Therefore, whenever a misleading statement is alleged to trigger a duty to disclose additional information, a two-staged materiality inquiry is required. First, the "triggering" statement itself must be material. If this statement is deemed material, and additionally found incomplete or misleading, then the duty to disclose arises. At that point, the court can proceed to the second stage of the inquiry: whether the omitted fact itself is material.

The relevance of *Shaw* in duty to disclose cases is illustrated by the First Circuit's *Computervision* and *Summa Four* decisions, which more centrally involved duty to disclose issues. In both instances, the Court found that a duty to disclose had not been triggered, citing *Shaw* in finding that the allegedly misleading statements were imma-

---

**15.** The Court noted that "[i]n deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment. Were the rule otherwise, a plaintiff could maintain a claim of fraud by excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement." *Shaw,* 82 F.3d at 1220 (citations omitted).

terial and thus not of a nature that could trigger a duty to disclose. In *Summa Four,* a fraud on the market § 10(b) case, a press release had announced that "significant orders" had been received by the company during the past quarter, without noting that the profits from these orders would not be realized in the immediate next quarter due to contracting and shipping delays. *See Summa Four,* 93 F.3d at 994–95. Allowing that the statement could carry a positive (and false) implication about the next quarter's operations—that orders received in one quarter will be filled and profited from in the next quarter—the Court nonetheless held that the statement did not trigger a duty to disclose the shipment delays: "[W]e think this statement falls in the category of vague and loosely optimistic statements that this court has held nonactionable as a matter of law." *Id.* at 995.

This same rationale is evident in the *Computervision* case. While *Computervision* involved section 11 and 12(2) claims based on statements in a public offering prospectus, a duty to disclose was invoked as to one of the claims: *optimistic statements in the prospectus about a new product were allegedly misleading absent disclosure of the technical and developmental problems facing that product. See Computervision,* 90 F.3d at 635–36. Examining the context in which the statement was made, the Court found that other statements in the prospectus rendered this isolated statement of optimism immaterial. *Id.* Moreover, noting that the statements suggested the type of optimism that is "not unusual for a company releasing a new product," the Court concluded that "Computervision's statements did not rise to the level of optimism or certainty that would make them materially misleading in the absence of disclosure of initial developmental problems the product was facing." *Id.* at 636.

■ Armed with these precedents, the Court can now turn to the task at hand. Plaintiffs assert that APC's statements were either false in and of themselves, or incomplete, inaccurate, or misleading in light of the nondisclosed component defect. Under either theory of liability, however, the initial question is the same: could the market have viewed the challenged statements as altering the total mix of investment information available? If the statements are deemed immaterial as a matter of law, the Court cannot impose any liability on APC for a misrepresentation, nor conclude that APC was under a duty to disclose additional information about the component defect.

In this light, the Court finds that a number of the statements on which plaintiffs rely are immaterial as a matter of law, statements which the market could not have reasonably taken into account in setting the market price of APC stock. Dowdell's statement recognizing the "significance of newly emerging international markets and the vast potential for [APC's] products in these areas of the world" (June 2 Press Release) is the sort of "rosy affirmation" rendered nonactionable by *Shaw.* Moreover, even if the statement *in isolation* might imply a material comment on the direction of APC's future operations, the context in which the statement was made— APC's announcement of a new Vice President for Worldwide Business Development— would lead an investor to downplay its significance. Viewed as a whole, the release amounts to little more than corporate cheerleading, a CEO waxing eloquent on the virtues of his company. For these reasons, the statements in this release are not actionable.

Similarly, the Court finds nonactionable a number of the statements attributed to Dowdell during the annual meeting of shareholders (June 14): "we are gaining market share, we are gaining momentum, and our revenues are strong," and that APC had a "global focus that many of our competitors do not." These are statements that the market "would easily recognize as nothing more than a kind of self-directed corporate puffery," *Shaw,* 82 F.3d at 1218, and are thus nonactionable. The same holds true for the statements about "improving manufacturing efficiencies," the move "towards more traditional levels of efficiency," the company's "good opportunities to expand its products offerings," and the expectation that "1995 [is going] to be a busy year." (April 24 Press Release). As was the case above, these statements offer little more than sales talk, an example of a CEO "talking-up" his compa-

ny with the "kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace." *See Shaw,* 82 F.3d at 1217. Indeed, the market could have expected nothing less from a CEO, i.e. predictions of efficiency improvements and a busy year. Accordingly, the Court need not consider whether a reasonable investor could have found these statements misleading—either way they could not have influenced the market price of the stock.

As for the remaining statements relied upon by plaintiffs, the Court cannot properly deem these immaterial as a matter of law, in light of the nature, context, and substance of these statements. For instance, a reasonable investor could certainly factor into his investment decision information provided in securities analysts' reports or a company's 10–Q quarterly filing. Similarly, the market could certainly view the following assertions by APC personnel as adding to the total mix of information available: (1) that APC had stepped-up production in anticipation of Windows 95 (July 3 HFN Article); (2) that APC was outshipping a major competitor "by as much as 460 to 1" (statement during shareholder meeting); and (3) that APC's high inventory levels were required to meet swelling demand (statement during shareholder meeting). These statements cannot be characterized as "rosy affirmations" that the market would easily brush-off as corporate puffery. Rather, they appear to be statements offering hard facts about the current state of APC's operations, adding to the mix of information the market would take into account in setting the price for APC stock. *See Shaw,* 82 F.3d at 1219 (statements that the company anticipated "breaking even" offered hard facts about cash flows, and thus went beyond vaguely optimistic statements).

The inquiry does not end there, however, as APC has raised a number of additional arguments concerning the actionability of the remaining statements. The Court, therefore, considers each statement in turn, to determine whether each forms a basis for the fraud on the market claim in the present case.

*Analyst Reports (April 26, April 27, May 11):*

█ As was noted above, there can be little doubt that reasonable investors could take information in analysts' reports into consideration when making investment decisions; as such, the market would have factored these reports into the equation when setting the price of APC's stock. Moreover, there are facts from which the fact-finder could reasonably conclude that information in the reports was either false or misleading: specifically, from the reports noting APC's "strategic decision" to increase inventories in anticipation of "peak summer demand," a reasonable person would not imagine that the true cause for rising inventory levels was a production slowdown needed to remedy a defective component. Thus, these reports could serve as the basis for liability, either as direct misrepresentations or as half-truths which triggered a duty to disclose the contributing cause of the inventory build-up.

APC asserts, however, that the statements by the third-party financial analysts should not be attributed to the company. While the First Circuit has not yet determined when the independent reports of analysts may be imputed to a securities fraud defendant, as a general rule such attribution is only proper when the company has "sufficiently entangled itself with the analysts' forecasts to render those predictions 'attributable to it' ..." [by placing] its imprimatur, expressly or impliedly, on the analysts' projections." *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2d Cir.1980); *see also Raab v. General Physics Corp.,* 4 F.3d 286, 288–89 (4th Cir. 1993). Such "entanglement" exists, *inter alia,* when a company edits or approves the final version of the report, *see Greenberg v. Compuware Corp.,* 889 F.Supp. 1012, 1020–21 (E.D.Mich.1995), or where company managers make misstatements of fact to an analyst which are incorporated into the analyst's report, *see Colby v. Hologic, Inc.,* 817 F.Supp. 204, 213–15 (D.Mass.1993) (no attribution; reports neither quoted company officials, nor made reference to allegedly misleading information provided by company).

In the present case, there are sufficient facts to support a finding that any misstate-

ments in the analysts' reports were caused by APC's management. The reports reference numerous conversations with APC management on the question of APC's build-up of inventories, during which APC gave its explanation for the increase in inventories. From that, it would be reasonable for the fact-finder to infer that any misrepresentations in the reports were based on or caused by false or misleading information obtained directly from APC.[16] Such causation, if proven, is sufficient to support APC's liability through the attribution of the statements. *See Schaffer v. Timberland Co.*, 924 F.Supp. 1298, 1310–12 (D.N.H.1996) (company held liable where complaint "reasonably demonstrate[d] that the analysts' statements were based on specific information provided directly by the defendants."); *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 602–03 (N.D.Cal.1991) (same).[17] Of course, whether this in fact occurred is ultimately a question for the jury. *See Alfus*, 764 F.Supp. at 603 (whether information was in fact provided to analysts by company is a question for the trier of fact).

The complaint's assertion of attribution also satisfies the pleading requirements of Rule 9(b). As APC correctly recognizes, Rule 9(b) is given a particularly strict application in this context. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994) (noting strict application of Rule 9(b) for attributed statements). In *Time Warner*, for example, the Second Circuit held that anonymous statements made by alleged corporate insiders to analysts, and later incorporated in the analysts' reports, could not be imputed to the

company, "even when the plaintiff alleges on information and belief that the unattributed statement was made by an agent of the defendant." *Id.* According to the Court, Rule 9(b) required a more detailed "link between the defendants and the unattributed statements." *Id.* at 266; *see also Colby,* 817 F.Supp. at 215 (complaint fails where no link drawn between analysts' statements and defendants).

The present case does not involve the sort of anonymous and "completely unattributed" analysts' statements that were at issue in *Time Warner,* however. On the contrary, both the complaint and the text of the analysts' reports themselves suggest the identity of the speakers: the statements were allegedly made to analysts by APC management, and specifically by CEO Dowdell. As other courts have recognized, such pleading is adequate to support attribution. *See Kas v. Caterpillar, Inc.,* 815 F.Supp. 1158, 1173 (C.D.Ill.1992) (analysts' conclusions "based on conversations with management" satisfied Rule 9(b)); *Alfus,* 764 F.Supp. at 602–03 (same for analysts' conclusions "based in large part on information provided by management").[18] Therefore, plaintiffs have satisfied Rule 9(b) in regards to their claim that any misleading statements in the analysts' reports concerning inventory were caused by APC.

*Statements in APC's Form 10–Q:*

 Plaintiffs also allege that the "Management Discussion" in APC's 10–Q report for the first quarter of 1995 was misleading in its discussion of inventory levels. The discussion noted that inventory levels had

---

16. The complaint also cites statements made by analysts later in 1995, after APC disclosed the defect, noting that APC had not been forthcoming with the investment community on the question of inventory. These statements offer further support for the inference plaintiffs seek to draw.

17. Finding the analysts' statements attributable to APC on these facts also dovetails with the market-centered rationale advanced by the First Circuit in *Shaw.* As was discussed above, *Shaw* re-focused the inquiry in fraud on the market on the perceptions of "the market" at large, not an individual investor. *See Shaw,* 82 F.3d at 1218. The same focus on the market carries over to the question of attribution: after reading the reports,

would the market understand the statements made therein as the analyst's own opinions, or alternatively as an account of a representation made to the analyst by the company? The latter can support an action against the company; any remaining issues—whether the representation was actually made to the analyst, if it was reported correctly, and if it was misleading—are all questions for the trier of fact.

18. Indeed, the Second Circuit cited *Alfus* as a case where plaintiffs had drawn a sufficient link between the statements in the analysts' reports and the corporate employee who allegedly caused these statements. *See Time Warner,* 9 F.3d at 265.

increased during the first quarter, an increase "needed to support the growth in the Company's sales volume, as well as the need to increase the carrying levels of raw materials, in-process assemblies and finished stock as a result of major new products introduced during the fourth quarter of 1994." Plaintiffs have not challenged the truthfulness of this statement, nor could they under their theory of the case. The purpose of this quarterly filing was to provide information about APC's first quarter operations. Because the defect was not discovered until the *second* quarter, this as of yet undiscovered problem could not have influenced APC's *first* quarter inventory levels. In other words, APC's inventories as of the first quarter of 1995 were in no way connected to any defective component, because as of that time no such defect was known to exist.

Instead, plaintiffs claim that APC's discussion of inventories was misleading by omission, in that by the time the 10–Q was filed (May 12, 1995) APC had become aware of the defect, and should have discussed in the 10–Q how the discovery might further influence inventories in the next quarter. As APC correctly points out, "accurate reports of past successes do not themselves give rise to a duty to inform the market whenever present circumstances suggest that the future may bring a turn for the worse." *Shaw*, 82 F.3d at 1202. There is no need to consider whether the 10–Q disclosure "triggered" any further duty to disclose here, however, as the Court determines that the regulations governing the 10–Q filing imposed an *affirmative* duty on APC to disclose information about the defect and any consequential effect on inventory levels.

17 C.F.R. § 229.303(b), or Item 303(b), prescribes the information that must be provided in the "Management Discussion" sec-

tion of the 10–Q disclosure. Under this section, management is required to discuss any "material changes in those items specifically listed in paragraph (a) of this Item." [19] Item 303(a)(3)(ii) reads as follows:

> Describe *any known trends or uncertainties* that have had or that *the registrant reasonably expects will have* a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of *events that will cause a material change in the relationship between costs and revenues* (*such as known* future increases in costs of labor or materials or price increases or *inventory adjustments*), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(ii) (1996) (emphasis added).

The Court concludes that this provision imposed an obligation to disclose the discovery of the defect in its first quarter 10–Q report, even though the effects of the discovery would not be realized for accounting purposes until the next quarter. At the time of the filing, APC allegedly had knowledge of an "event"—the discovery of the defective component—that would "cause a material change in the relationship between costs and revenues." Even if, as APC argues, they were not able to quantify the exact impact of the defect at the time of the filing, at the very least this was a "known uncertainty" that APC would have reasonably expected to influence its operations. Accordingly, because APC was under an affirmative duty to disclose the discovery of the defect and did not, the Court finds this omission to be actionable.[20]

The Court recognizes the oft-cited maxim that the securities laws impose no obligation on a company to disclose "forward-looking

---

**19.** Item 303(b) imposes the disclosure obligations for the interim 10–Q reports, while Item 303(a) does the same for a corporation's annual 10–K disclosures. Because Item 303(b) explicitly incorporates some of the requirements of Item 303(a), much of the same information is required of both disclosures.

**20.** In so finding, the Court is not, as APC suggests, creating a private right of action for a violation of an SEC regulation. On the contrary,

the Court is simply relying on the rather uncontroversial proposition that when a corporation is under an affirmative duty to disclose material information—whatever the source of the disclosure obligation—nondisclosure is actionable under the securities laws. *See Shaw*, 82 F.3d at 1221–22 & n. 37 (section 10(b) claims for nondisclosure of material facts omitted from prospectus and registration statement, in violation of SEC regulations, survived motion to dismiss).

information such as internal projections, estimates of future performances, forecasts, budgets, and similar data." *Shaw*, 82 F.3d at 1209. The Court has not imposed such a duty on APC with its determination here, however. At the time the 10–Q was filed, APC allegedly knew that the defect had caused (and would continue to cause) an inventory adjustment and other material changes during the current quarter. The information concerning the defect thus was something more than a mere forward-looking projection, estimate, or forecast about the current quarter. On the contrary, APC had knowledge of "hard" information about a "known trend or uncertainty" that would have a material impact on its current operations, and consequently was under an obligation to disclose this information in its 10–Q. *See Computervision*, 90 F.3d at 631–32 ("known trends and uncertainties" of Item 303 "understood as referring to those trends discernible from hard information alone"); *Shaw*, 82 F.3d at 1207–11 & n. 21 (differentiating "soft" projections and forecasts from "hard" current quarter information about material changes that was subject to disclosure in an offering statement).

Finally, APC's reliance on *In re Healthco Int'l, Inc. Sec. Litig.*, 777 F.Supp. 109 (D.Mass.1991), does not affect this Court's decision. In *Healthco*, the Court dismissed a claim that a company's third quarter 10–Q, published six weeks into the fourth quarter, was misleading in that it failed to disclose material facts about fourth quarter losses known to the company at the publication date. *Id.* at 111–12. *Healthco* is distinguishable from the present case. The *Healthco* plaintiffs had not "pointed to any statute or regulation requiring Defendants to include material information concerning their fourth quarter in their third quarter report." *Id.* at 114. Of course, this is not the case here, as this Court concludes that Item 303(b) compels disclosure. Moreover, even if the *Healthco* plaintiffs had cited Item 303(b), the Court found that their complaint would not have satisfied Rule 9(b), as the facts did not support the inference that defendants had knowledge of fourth quarter information at the time of the 10–Q filing. *Id.* Again, the present case is distinguishable, as there are

sufficient facts averred in the complaint to support the inference that APC knew about the component defect at the time the 10–Q was filed.

*Statements to Shareholders (June 14):*

Two statements made by CEO Dowdell during the annual meeting of shareholders remain for the Court's consideration: (1) that APC was "now outshipping [a competitor] by as much as 460 to 1," and, (2) that APC's high inventory levels were not at all unusual or a cause for concern, as the overstocks were required to meet swelling demand.

■ The first of these can be dismissed with little comment. Plaintiffs do not contend that the "outshipping" comment was false. Instead, they maintain that the reference to shipping volumes was misleading and incomplete, alleging that APC was unable to ship its products for some time prior to the meeting due to the defect. However, even assuming that a shipment stoppage did occur in ·the weeks prior to the meeting, this fact would not render Dowdell's statement misleading. Because the truth of the statement is unchallenged, the Court must assume that the "460 to 1" ratio had already taken any recent shipping problems into account. While the plaintiffs essentially ask this Court to impose a duty on APC to explain *why* a higher ratio was not achieved, the Court cannot properly impose such a duty. *Compare Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (just because company reveals one fact about a product, it does not mean that all other facts that "would be interesting [or] market-wise" must also be disclosed).

■ The allegedly misleading explanations offered for the company's increasing inventory levels are actionable, however. Plaintiffs have alleged that the swell in inventories was caused by the "fallout" of the component·defect: to wit, products were returned, production was slowed-down, and shipments were delayed. A reasonable person could draw the inference that these events, if they in fact occurred, caused raw material and finished product inventory levels to increase. If such a finding is made, APC's statement to shareholders would have

been misleading: either the explanation offered was an outright falsehood, or it was a half-truth, wherein APC was telling only part of the story; i.e., APC disclosed one cause for increasing inventories, but failed to add a substantial contributing cause. In either case, such deception would be sufficient to support a securities fraud claim. *See Roeder v. Alpha Indus.*, 814 F.2d 22, 26 (1st Cir. 1987) (even voluntary disclosures must be "complete and accurate," revealing the "whole truth").

APC responds to this line of argument with a rhetorical question on the materiality issue: "How are these statements supposed to have misled plaintiffs into purchasing APC stock?" As was noted earlier, the question of materiality is generally left to the jury. *See Shaw*, 82 F.3d at 1217. To further respond to APC's contention, however, the Court again relies on *Shaw* in recognizing that the context in which a statement is made reflects on the issue of materiality. Dowdell's statement was reportedly offered after some analysts and stockholders present at the meeting expressed concern about APC's inventory levels; the statement responded to those concerns. Thus, it is reasonable to conclude that the market at that time was paying close attention to APC's inventory levels, and would have considered the causes for that build-up important in making investing decisions concerning APC stock. For these reasons, the statement cannot be deemed immaterial as a matter of law.

*Statement in July 3 HFN Article:*

■ Plaintiffs assert that an excerpt from this article is false and misleading. The article generally discusses an increase in demand for APC products that was expected to occur following the much-anticipated August 1995 release of Microsoft Windows 95, an increase that was likely because APC was the only power supply vendor certified by Microsoft. Drawing its information from a conversation with APC product manager Andrew Kallfelz, the article concludes by noting that APC had stepped-up production in anticipation of Windows 95. Plaintiffs maintain

that because production was in fact delayed or shut down in the weeks leading up to the article, any suggestion by APC that production had been stepped-up is patently false.

The Court finds that this statement is actionable. If it is shown that APC did indeed slow production as a result of the defect, any suggestion that production was stepped-up would be contradicted, or at the very least misleading without reference to any current production difficulties. At various points in its briefs, APC challenges this factual predicate—the assertion that production was slowed down as a result of the defect. However, this is a factual question reserved for the jury; for the purposes of this motion to dismiss, the Court is satisfied that plaintiffs have alleged sufficient facts from which a reasonable person could infer that the defect caused delays in production, directly contradicting the assertion in the article.

■ APC also raises an argument that the statements in the HFN article should not be attributed to APC, since the article did not directly quote APC personnel directly. However, the Court sees that a sufficient link between the statement in the article and the alleged source at APC has been drawn. After reading the article in question, it is reasonable to infer that the writer received all her information about APC's operations, including the "step-up" in production, from conversations with the APC product managers named in the article. As was the case with the analysts' reports, if APC personnel caused the misrepresentation in the article, the statement can be attributed to APC. *See In re Columbia Sec. Litig.*, 747 F.Supp. 237, 245 (S.D.N.Y.1990) ("If, as plaintiffs allege, [defendant] made a false statement to the *Forbes* reporter, that statement may properly serve as a basis for plaintiffs' fraud claim.").[21]

*Redefinition of the Class Period*

To summarize, the Court concludes that the plaintiffs may pursue their section 10(b)

---

21. Nor is Rule 9(b) an issue here, as the identity of the source of the reporter's information has

been pled with sufficient particularity.

claims based on the alleged misstatements and omissions in: (1) the various securities analysts' reports; (2) APC's first quarter 10–Q report; (3) statements made during the shareholder meeting concerning inventory levels; and, (4) the July 3 HFN article. The remaining statements cited in the complaint are not actionable for the reasons discussed above.

■ Because the Court has found the statements in the April 24 press release non-actionable, the earliest statement on which plaintiffs can base a claim is now the Smith Barney report, issued on April 26, 1995. Accordingly, some redefinition of the Class Period is in order, as only those who purchased APC stock on or after April 26, 1995 (and before July 27, 1995, when disclosure occurred) could have suffered cognizable injury. Plaintiffs can amend their complaint to redefine the Class Period to reflect these new limiting dates, or the Court will determine that this is the Class Period to be used if and when a motion for class certification is filed and granted.[22]

*Dismissal of Lewis and Steinberg Complaint (No. 95–423L)*

The Court notes that two of the named plaintiffs, Lynn Lewis and Jeffrey Steinberg, fall outside of these new limiting dates: Lewis purchased APC stock on April 24, 1995, while Steinberg purchased stock on April 17, 1995. Because no actionable statements were made before these purchases, the Lewis and Steinberg complaint no longer states a claim under a fraud on the market theory. Therefore, the Lewis and Steinberg complaint is dismissed.

*Additional Rule 9(b) Considerations .*

■ As an alternative basis for dismissal, APC asserts that plaintiffs have failed to plead fraud with particularity as required by Rule 9(b). APC's primary challenge on this point is on the issue of scienter: that plaintiffs have failed to allege specific facts to

permit a reasonable inference that APC had knowledge concerning the defect and the consequences of the defect at the time the alleged misrepresentations were made. The Court disagrees with APC's contention, however, and concludes that the complaint survives Rule 9(b) scrutiny.

As an initial matter, the complaint cannot be fairly characterized as resting on conclusory allegations of scienter. Plaintiffs have set forth a series of factual allegations that could have provided a basis for knowledge of the defect, and knowledge of the costs and delays associated with the defect, at the time the alleged misrepresentations were made. First, plaintiffs point to late-summer 1995 statements by APC officials which reasonably could be read as admissions that APC knew, before the Class Period even began, that a defect in many of its products would result in rework expenses, increased inventories, and production and shipping delays. *Compare In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549 & n. 9 (9th Cir.1994) (Rule 9(b) scienter standard most easily satisfied with "statement by defendant along the lines of 'I knew it all along' ").

Second, the factual "chain of events" presented in the complaint has provided a basis for knowledge on the part of APC personnel that the defect was causing costs and delays. Indeed, plaintiffs have alleged a fairly specific sequence of events: products were returned to APC for defective operation, the faulty component was isolated, production and shipment was delayed in order to rework the new products, and both raw material and finished-product inventories swelled as a result of these delays. *See Shaw,* 82 F.3d at 1224 (discussing chain of events alleged by plaintiffs that established scienter). These developments, which certainly would have been known to APC management,[23] are sufficient to support an inference of scienter for both the misrepresentation and insider trading claims.

---

22. Per the Court's November 28, 1995 Order, plaintiffs have thirty (30) days from the date of this decision to serve and file their motion for class certification.

23. The complaint also details how and why each of the Individual Defendants, in their daily management roles at APC, would have been aware of the daily operational difficulties occasioned by the defect.

Finally, the Court notes that the timing of the alleged insider trades further supports the inference of scienter. As the First Circuit recently recognized:

[T]he mere fact that insider stock sales occurred does not suffice to establish scienter. However, *allegations of "insider trading in suspicious amounts or at suspicious times" may permit an inference that the trader—and by further inference, the company—possessed material nonpublic information at the time....* [W]e think that the plaintiffs' allegations of insider trading, inasmuch as they are at least consistent with their theory of fraud, provide some support against the defendants' motion to dismiss under Rule 9(b).

*Shaw*, 82 F.3d at 1224 (citations omitted) (emphasis added). The inference of scienter drawn in *Shaw* from insider trades "at suspicious times" and "suspicious amounts" is equally applicable here, in light of the timing and sheer volume of insider trades alleged by plaintiffs.

For these reasons, the Court finds that the complaint easily satisfies the pleading requirements of Rule 9(b).

### B. Section 20(a) Control Person Liability Claims

 Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes joint and several liability on individuals who control an entity liable for violations of the securities laws.[24] In order to state a claim under this section, a plaintiff must show: (1) a primary violation of the securities laws, and (2) that the individual defendant exercised control over the entity that engaged in the unlawful conduct. *See Sheinkopf v. Stone*, 927 F.2d 1259, 1270–71 (1st Cir.1991).[25]

APC's only argument in support of its motion to dismiss the § 20(a) control person liability claims is that plaintiffs have not alleged an actionable primary violation of the securities laws. *See Haft v. Eastland Fin. Corp.*, 755 F.Supp. 1123, 1133–34 (D.R.I. 1991) (dismissing section 20(a) claims upon dismissal of underlying section 10(b) claims). Clearly, APC's argument on this point fails, in light of the Court's determination that a number of the challenged statements are indeed actionable under section 10(b). Moreover, the question of whether the Individual Defendants exercised sufficient control over APC is an inherently factual question improper for resolution on a motion to dismiss. *See Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1122 (D.R.I.1990). As the complaint sufficiently details the manner in which each of the Individual Defendants participated in and exercised control over APC's activities, the Court will allow plaintiffs to pursue their section 20(a) claims.

### C. Section 20A Insider Trading Claims

 Two of the named plaintiffs (Lohner and Mason)[26] have also asserted insider

---

**24.** "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a) (1994).

**25.** Some courts also require plaintiffs to prove scienter on behalf of the controlling person. *See e.g., Robbins v. Moore Medical Corp.*, 788 F.Supp. 179, 188 (S.D.N.Y.1992). *But see Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574–75 (9th Cir.1990), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991) (liability premised solely on control relationship).

While the First Circuit has not addressed the issue, the Ninth Circuit recently noted that where the scienter of the company is sufficiently pled, the requisite knowledge of the controlling person necessarily follows. *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396–98 (9th Cir.1993). Under this rationale, the burden shifts to the individual defendant to prove that even though he was a controlling person, he was not aware that a violation was occurring, *id.*, which would in effect raise the "good faith" defense of section 20(a).

**26.** The complaint names a third person, Charles McInnis, as a party-plaintiff to the section 20A claim. However, McInnis was not named as a party to any of the five original actions, nor is he named in the caption of the consolidated complaint. Further, while McInnis might qualify as a member of the class alleged by the complaint, as of yet no such class has been certified by this Court. As such, McInnis is not yet a party to this action, and thus the Court will not consider any claims he might have at this time.

trading claims against defendants Machala and Davis pursuant to section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t–1. This section provides a private right of action for securities law violations based on contemporaneous trading.[27] Under section 20A, an insider who trades shares of stock while in possession of material, non-public information is liable to any person who traded contemporaneously with the insider. While this provision is a fairly new addition to the Securities Act, added by amendment in 1988, the few reported decisions have been in general agreement on what is needed to state a claim under § 20A: (1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and, (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an independent violation of the Securities Exchange Act of 1934. *See, e.g., Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703–04 (2d Cir.1994); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871–72 (9th Cir.1993).

Defendants urge dismissal of the section 20A claims on the ground that plaintiffs have failed to plead an independent violation of the securities laws. Specifically, defendants assert that plaintiffs have not pointed to any material, nonpublic information known to Machala and Davis at the time of trading to trigger application of the "disclose or abstain" rule of *Chiarella v. United States*, 445 U.S. 222, 229, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980).

The Court cannot agree with this contention, since there are sufficient facts set forth in the complaint to support an inference that the two named Individual Defendants had knowledge of material, undisclosed informa-

tion at the time they sold their APC stock. First, as the Court has discussed at length, a reasonable investor certainly could have viewed ongoing production difficulties caused by the defect as material information to be included in the investment decision. Moreover, a reasonable person could draw the inference that Machala and Davis were aware of these ongoing difficulties at the time of their trades, in light of the details given in the complaint concerning the management duties assumed by Machala and Davis at APC. Therefore, the Court will allow these plaintiffs, who bought APC shares on the same days that Machala and Davis sold their shares,[28] to maintain their section 20A claims against these defendants.

## III. Conclusion

For the foregoing reasons, the defendants' motion to dismiss is denied in *Simon* (No. 95–415L), *Mason* (No. 95–416L), *Lohner* (No. 95–426L), and *Friends of Chabad Lubavitch* (No. 95–428L), and granted in *Lewis* (No. 95–423L). In addition, in light of the Court's conclusion that the first actionable statement was issued on April 26, 1995, the Class Period will be redefined if and when a motion for class certification is filed and granted.

It is so ordered.

---

**27.** "Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable ... to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." 15 U.S.C. § 78t–1(a) (1994).

**28.** Because the named plaintiffs traded on the same day as Machala and Davis, the "contempo-

raneous" requirement of section 20A is clearly satisfied. As such, the Court need not at this time determine whether a "contemporaneous" trader under this section includes someone who traded in the days or weeks after the alleged insider trade. *See In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1488–89 (N.D.Cal.1992) (section 20A "meant to protect and compensate investors who trade at the same time as the insider or for some short period thereafter, and that a reasonable period of liability could be as short as a few days, but no longer than a month."), *aff'd*, 11 F.3d 865 (9th Cir.1993).